**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-1622**

───────────

DEWBERRY ENGINEERS INC., a New York corporation,

Plaintiff - Appellee,

v.

DEWBERRY GROUP, INC., f/k/a Dewberry Capital Corporation, a Georgia corporation,

Defendant - Appellant.

───────────

**No. 22-1845**

───────────

DEWBERRY ENGINEERS INC., a New York corporation,

Plaintiff - Appellee,

v.

DEWBERRY GROUP , INC., f/k/a Dewberry Capital Corporation, a Georgia corporation,

Defendant - Appellee.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, Senior District Judge. (1:20-cv-00610-LO-IDD)

───────────

Argued: May 3, 2023                    Decided: August 9, 2023

───────────

Before GREGORY, THACKER, and QUATTLEBAUM, Circuit Judges.

───────────

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Thacker joined. Judge Quattlebaum wrote a dissenting opinion.

_____

**ARGUED:** Gail Ellen Podolsky, CARLTON FIELDS, PA, Atlanta, Georgia, for Appellant. Elbert Lin, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Daniel Felsen, CARLTON FIELDS, PA, Washington, D.C., for Appellant. Arthur E. Schmalz, Washington, D.C., Stephen P. Demm, Brian A. Wright, David M. Parker, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellee.

_____

GREGORY, Circuit Judge:

Two companies that operate in the real estate development industry have spent years embroiled in a dispute over their shared name: "Dewberry." This appeal concerns their latest spat—Dewberry Engineers has sued Dewberry Group to quell the latter's use of several new insignias it developed as part of its rebrand. Dewberry Engineers owns federal trademark rights to the "Dewberry" mark and claims Dewberry Group's rebranding efforts infringe that mark and breach an agreement struck between the sparring corporations over a decade ago. The district court sided with Dewberry Engineers in the proceedings below, assessing a nearly $43 million profit disgorgement award against Dewberry Group for its infringement, enjoining it from further breaches of its agreement with Dewberry Engineers, and ordering it to pay attorneys' fees for forcing Dewberry Engineers to litigate an exceptional case of trademark infringement. We affirm the district court's judgments.

I.

A.

This dispute includes not one, but two businesses bearing the "Dewberry" name while engaged in commercial real estate development. The first, Dewberry Engineers, started in the mid-1950s as a civil engineering and surveying firm in Northern Virginia. Over time, its business expanded to include real estate development services such as architecture and site development, among other offerings. Although the firm's title cycled through different iterations involving the name "Dewberry" over the years, it presently operates as Dewberry Engineers. Dewberry Engineers provides its services through

3

affiliated entities under common ownership and control to clients all over the United States—Georgia, Virginia, Florida, and South Carolina in particular.

The second business, Dewberry Group, similarly provides real estate development services through its affiliates, all of which are owned by real estate developer John Dewberry. The Atlanta, Georgia-based Dewberry Group exclusively serves John Dewberry and Dewberry Group's affiliates who in turn lease commercial property to tenants in Georgia, Virginia, South Carolina, and Florida.

Whatever peaceful coexistence the parties enjoyed ended in 2006 when each confronted the other over their competing "Dewberry" brands. Dewberry Group—then called Dewberry Capital—struck first by sending Dewberry Engineers a cease-and-desist letter that asserted "a likelihood of confusion or mistake exists between the parties' respective marks." J.A. 3714–15. It argued that, although Dewberry Engineers held a federal trademark for "Dewberry," Dewberry Group had senior common law rights to the use of "Dewberry" in connection with real estate development and related services.

Dewberry Engineers agreed that the marks are confusingly similar and escalated matters to a lawsuit against Dewberry Group for trademark infringement. Dewberry Engineers argued that it would be harmed by Dewberry Group's use of its "Dewberry" mark because both parties used their marks in connection with real estate development services. Dewberry Group counterclaimed for common law infringement, claiming that Dewberry Engineers' marks "so resemble Dewberry Capital's DEWBERRY CAPITAL mark . . . as to be likely to cause confusion, mistake, or deception when used in connection with real estate development services." J.A. 2463–64. Pertinent to the parties' competing allegations, the

U.S. Patent and Trademark Office ("USPTO") had made an initial finding by then that there

was a likelihood of confusion between "Dewberry" and "Dewberry Capital," declining

registration of "Dewberry Capital" on that basis.

That litigation did not reach the merits, however, because the parties signed a confidential

settlement agreement (the "CSA") in 2007. The CSA allows Dewberry Engineers to use its

registered marks freely, and prevents Dewberry Group from challenging these registrations:

> 4. [Dewberry Engineers] may use its DEWBERRY marks and names at any
> time for any services or products it chooses throughout the United States and
> elsewhere.
>
> . . .
>
> 8. [Dewberry Group] … shall withdraw any pending challenges to
> [Dewberry Engineers'] federal trademark registrations, and shall not
> challenge or take action against Dewberry's federal trademark registrations.

J.A. 1198–99 ¶¶ B.4, B.8. By contrast, the CSA strictly limits Dewberry Group's use of

"Dewberry":

> 2. Except as provided in Paragraph B.3, below, . . . [Dewberry Group] may
> use the DEWBERRY CAPITAL name and mark in connection with its
> promotion, offering and performance of real estate development services.
>
> . . .
>
> 3. To the extent that [Dewberry Group] performs any … real estate
> development or related services in [Virginia, D.C., or Maryland], it shall do
> so only under the name and mark DCC and not under the name or mark
> DEWBERRY CAPITAL.
>
> . . .
>
> 5. [Dewberry Group] will expressly abandon any pending applications to
> register the DEWBERRY CAPITAL mark for real estate development and/or
> real estate related services.
>
> . . .

5

6. [Dewberry Group] will not use the word DEWBERRY … in connection with any architectural or engineering services.

. . .

10. Where feasible, [Dewberry Group] shall continue to use its column logo …. [Dewberry Group] shall not use a logo or design mark that depicts a "dewberry" or "berry," and [Dewberry Group] shall not use a logo or design mark that is confusingly similar to [Dewberry Engineers'] "dewberry" logo and design mark . . . .

*Id.*

Dewberry Engineers also agreed not to oppose Dewberry Group's then-pending applications to register five specific Dewberry-related marks. And both parties agreed to dismiss their claims in the prior litigation and released each other from any claims they "could have asserted" there. J.A. 1200–01 ¶¶ B.14–B.15.

For a time, the parties retreated to the status quo. The armistice dissolved in 2017, however, when Dewberry Group decided to revamp its brand. After the successful launch of The Dewberry® hotel in Charleston, South Carolina, John Dewberry decided to change the suffix "Capital" to "Group," which would better align with the company's expansion into providing services for hospitality properties. John Dewberry also adopted several sub-brands: "Dewberry Living," "Dewberry Office," and "Studio Dewberry." Dewberry Group went further by creating a new logo that featured the letter D within a circle. When rebranding began, John Dewberry did not inform Dewberry Group's then-general counsel, David Groce, of the prior litigation or the CSA. Instead, he asked Groce to "do a search" for related trademarks. J.A. 3217. That search revealed Dewberry Engineers' "Dewberry"

mark.  Even after this, it appears that as of January 2018, Groce still was unaware of the CSA between the parties.

As a part of its rebranding efforts, Dewberry Group applied to register "Dewberry Group" with the USPTO for "[c]ommercial real estate development services." J.A. 1859–64. The USPTO rejected this application on December 20, 2017, "because of a likelihood of confusion" with the Dewberry Marks. J.A. 1841.  It explained that the "dominant wording DEWBERRY" in both marks was "identical in sound, meaning and essentially identical in appearance" and the parties' services were "highly related." J.A. 1841–42.  A week later, Dewberry Engineers sent Dewberry Group a letter objecting to its use of "Dewberry Group." Groce responded on January 11, 2018, "regret[ting] any concern" Dewberry Group caused and claiming he had not been "aware of the prior litigation or the [CSA]" and "ha[d] no intent to infringe [Dewberry Engineers'] valid trademark rights or to breach the terms of the settlement agreement." J.A. 3826.  He further promised "not to attempt to register the term DEWBERRY GROUP for real estate development services," or to "use the term in connection with any present or future real estate development or related services in Virginia, Maryland, or the District of Columbia." *Id.*  Instead, he promised to "use DCC or something else that is not confusingly similar to [Dewberry Engineers'] marks." *Id.*

In February 2018, Dewberry Group abandoned its first "Dewberry Group" application but continued rebranding, using "Dewberry Group" and "Studio Dewberry" marks on all "existing & future marketing material," J.A. 3227, including "all new leasing materials," J.A. 3239.  It later used these marks on new letterhead, business cards, email signatures, uniforms, and property signs.

7

Despite Groce's promises, Dewberry Group also applied to register four new "Dewberry" marks in April 2018: "D Dewberry Group," "Studio Dewberry," "D Dewberry Living," and "D Dewberry Office." All four were for real estate-related services. In response, the USPTO required Dewberry Group to disclaim the words "Group," "Studio," "Living," and "Office" (meaning Dewberry Group would not claim exclusive rights to those descriptive terms), leaving "Dewberry" as the only distinctive element.

In June 2018, Dewberry Engineers sent its second cease-and-desist letter demanding that Dewberry Group withdraw the applications for these new marks. Dewberry Engineers warned that Dewberry Group was intentionally infringing Dewberry Engineers' marks, breaching the CSA, and breaking Groce's recent promises. Dewberry Group refused to abandon the applications, claiming that the parties' marks were not confusingly similar, and that the CSA allowed its use of "Dewberry" marks other than "Dewberry Capital" for non-architectural services. Dewberry Engineers responded with a third cease-and-desist letter in July 2018, insisting again that Dewberry Group abandon its "Dewberry" marks. It explained that Dewberry Group had misread the CSA, and that Dewberry Group's new marks only increased the likelihood of confusion by eliminating "Capital"—which provided the financial connotation serving to distinguish the parties' marks. Dewberry Engineers also warned that Dewberry Group's marks had already "caused confusion in both the Charlottesville[, Virginia] area and the Northern Virginia area." J.A. 3831.

Meanwhile, Dewberry Engineers challenged Dewberry Group's applications at the USPTO. The USPTO rejected these applications due to a "likelihood of confusion" with Dewberry Engineers' marks. J.A. 2078. Like "Dewberry Group," it found, for example,

that "Studio Dewberry" was "confusingly similar" to Dewberry Engineers' marks, and the parties' services were "similar and related," particularly Studio Dewberry's "interior and exterior design for real estate." J.A. 2079. The USPTO reaffirmed those rejections after Dewberry Group had asked for reconsideration.

B.

Dewberry Engineers filed this action in May 2020, claiming breach of contract and trademark infringement under the Lanham Act and Virginia common law. The district court entered summary judgment in favor of Dewberry Engineers on both claims. *See Dewberry Eng'rs, Inc. v. Dewberry Grp., Inc.* (*Dewberry I*), No. 1:20-CV-00610, 2021 WL 5217016, at *1 (E.D. Va. Aug. 11, 2021).

With respect to breach of contract, the district court found the plain language of the CSA unambiguous. *Id.* at *2. Then it held that Dewberry Group violated paragraphs B.2, B.3, B.6, and B.10. *Id.* Supporting that conclusion, the district court looked to Dewberry Group's admitted use of the "Dewberry" mark within its promotional materials for "Studio Dewberry," which Dewberry Group touts for its architectural designs. *Id.* at *2–3. Next, the district court found that "[a]ccording to the terms of the CSA, [Dewberry Group] was obliged to continue using the column logo. Instead, [Dewberry Group] chose a new logo as part of its larger rebranding efforts." *Id.* at *4. That, the district court reasoned, directly violated the CSA. *Id.* Finally, the district court held that "[w]here [Dewberry Group] is shown to have performed real estate development activities in the Commonwealth of Virginia either (1) under the mark 'Dewberry Capital' or (2) not under the mark 'DCC,' it

9

is in breach." *Id.* at *5. Because it was "not difficult to find examples of such activities" the district court concluded that Dewberry Group violated paragraphs B.2 and B.3. *Id.*

As to trademark infringement, the court decided that Dewberry Engineers "established that the 'Dewberry' mark is valid, legally protected, and, having been in continuous use for more than five years following its registration, incontestable." *Id.* at *6. The question left to decide was whether application of a nine-factor test left any dispute that there was a likelihood of confusion between the parties' respective marks. The district court found no dispute on that question given: the similarity of the marks; the parties services and the regions in which they operate; the instances of actual marketplace confusion in the record; the investment by Dewberry Engineers into the goodwill of its trademark; and the evidence of negative publicity threatening to tarnish that goodwill due to confusion between Dewberry Engineers' and Dewberry Group's marks. *Id.* at *11.

The district court later held a three-day bench trial to calculate damages. *Dewberry Eng'rs, Inc. v. Dewberry Grp., Inc.* (*Dewberry II*), No. 1:20-CV-00610, 2022 WL 1439826, at *1 (E.D. Va. Mar. 2, 2022). Following this Court's test set forth in *Synergistic International, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006), the district court found profit disgorgement appropriate. *Dewberry II*, 2022 WL 1439826, at *8–9. But because Dewberry Group provided its infringing services to affiliate companies under common ownership, the court found that the revenues associated with Dewberry Group's conduct appeared on the affiliates' balance sheets. *Id.* at *9. Consequently, the court treated Dewberry Group and its affiliates as a single corporate entity for the purpose of calculating revenues and profits generated by Dewberry Group's use of infringing marks. *Id.* at *10.

10

The court determined that the tax information Dewberry Group presented did not reflect the "economic reality" of Dewberry Group's relationship with its affiliates. *Id.* And to account for some revenues unrelated to infringement, as well as costs, the district court reduced Dewberry Engineers' requested award of $53,719,657 by twenty percent—awarding Dewberry Engineers $42,975,725.60 in disgorgement profits. *Id.* at **13–14. Finally, the district court found this to be an "exceptional case" meriting an attorneys' fees award under the Lanham Act. *Id.* at *13.

In a later order, the district court issued a permanent injunction that prevents Dewberry Group from using the "Dewberry" mark in connection with real estate development services, except as permitted by the CSA. *See Dewberry Engineers Inc. v. Dewberry Grp., Inc.* (*Dewberry III*), No. 1:20-CV-610-LO-IDD, 2022 WL 1439105, at *5 (E.D. Va. May 6, 2022).

Dewberry Group timely appealed all three district court orders.

## II.

Dewberry Group first challenges the district court's grant of summary judgment to Dewberry Engineers on its breach of contract and trademark infringement claims. We review summary judgment decisions de novo. *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "The narrow questions before us on summary judgment are whether any genuine issues of material fact exist for the jury and if not, whether the district court erred in applying the substantive law." *Id.* Thus, we will grant summary judgment "only if, taking the facts in the best light for the nonmoving party, no material facts are disputed

and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003).

### A.

Beginning with the breach of contract claim, Dewberry Group argues that material disputes of fact warrant reversal of the district court's conclusions that Dewberry Group violated the CSA. A claim for breach of contract consists of "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016). No one disputes that the CSA is a valid and enforceable contract. The district court found the CSA unambiguous, and that Dewberry Group breached several paragraphs therein.

Paragraph B.6 of the CSA reads: "[Dewberry Group] will not use the word DEWBERRY in the name of, or as a mark for, any architectural and/or engineering company, or in connection with any architectural or engineering services." J.A. 1198. The district court found that Dewberry Group violated that provision on account of its promotional materials, like the Studio Dewberry webpage touting its architectural designs, *see* J.A. 2606–09, its promotional article in *Architectural Record* magazine, *see* J.A. 3616–18; 1262, and its architectural filings for the Dewberry Charlottesville building, *see* J.A. 2614–30; *see also* J.A. 1193 (crediting "Studio Dewberry" as one of its architects on leasing packages provided to clients). Each of these instances presented uncontroverted evidence that Dewberry Group used the "Dewberry" mark while providing architectural or engineering services. In addition, the district court found that these services benefited third

12

parties, despite Dewberry Group's argument that it only provided internal services. For example, Dewberry Group prepared drawings in connection to a zoning approval for a downtown City of Charlottesville building project on behalf of the project's owner, Deerfield Square Associates, II, LLC. Even more, the court found that "the services performed by [Dewberry Group] were in order to serve as a distinguishing mark of luxury, for the benefit of the tenants, investors, and brokers." *Dewberry I*, 2021 WL 5217016, at *4.

Paragraph B.10 states that "[w]here feasible, [Dewberry Group] shall continue to use its column logo in its current format . . . or in a substantially similar format." J.A. 1199. The district court concluded that because Dewberry Group "chose a new logo as part of its larger rebranding efforts" it breached its obligation that it "shall continue" to use the column logo. *Dewberry I*, 2021 WL 5217016, at *4.

Paragraph B.2 provides:

> Except as provided in Paragraph B.3, below, [Dewberry Group] may use the DEWBERRY CAPITAL name and mark in connection with its promotion, offering and performance of real estate development services as a real estate developer, including purchasing real property, arranging for the construction of commercial and residential buildings and mixed use properties, and leasing and managing properties.

J.A. 1198. Paragraph B.3, in turn, mandates that Dewberry Group "shall" use "the name and mark DCC and not under the name or mark DEWBERRY CAPITAL" if it "performs any present or future real estate development or related services in the Commonwealth of Virginia, the State of Maryland, or the District of Columbia." *Id.* The district court held that "[e]very time [Dewberry Group] performed such real estate development activities in Virginia— whether procuring financing, purchasing property, or submitting plans to the Board of

13

Architectural Review—doing so under the 'Dewberry' mark (or conversely, not under the DCC mark), it was in breach of the CSA." *Dewberry I*, 2021 WL 5217016, at *5.

Dewberry Group raises four arguments why we should set this analysis aside. But each fails to persuade us of any latent error in the district court's conclusions.

First, Dewberry Group revives its argument, rejected by the district court, that the CSA is ambiguous as to the meaning of "where feasible" in paragraph B.10 but it adds nothing of substance to convincingly suggest ambiguity. And our review reveals none.

Second, Dewberry Group argues that the district court should have considered parol evidence that the parties intended paragraphs B.2 and B.3 to apply only to "public facing" project names. Opening Br. 49. In Virginia, however, parol evidence is inadmissible if the CSA was "intended also as a complete and exclusive statement of the terms of the agreement." Va. Code Ann. § 8.2-202. And the CSA paragraph B.22 explicitly states that the "[p]arties expressly agree that they will not attempt in the future to argue that there were any other written or oral understandings or agreements between the [p]arties, as of the date of this Agreement, that are not expressly contained in this Agreement." J.A. 1203.

Third, Dewberry Group argues that its "in-house" activities were not technically architectural because they "do not require an architectural license." Opening Br. at 48. That distinction is fanciful and unsupported. As a matter of Virginia law, "[t]he 'practice of architecture' means any service wherein the principles and methods of architecture are applied, such as consultation, investigation, evaluation, planning and design, and includes the responsible administration of construction contracts." Va. Code Ann. § 54.1-400.

14

There is no dispute that Dewberry Group's activities (such as the Charlottesville project) provided some of these services.

Its fourth and final argument is that Dewberry Engineers did not establish an injury stemming from these breaches. The district court concluded that Dewberry Group's "negative publicity damages [Dewberry Engineers'] positive reputational standing." *Dewberry I*, 2021 WL 5217016, at *10 (cleaned up). For example, Dewberry Engineers provided evidence of negative publicity that mistakenly attributed Dewberry Group's Charlottesville development project—which news articles described as an "eyesore" and "blight," J.A. 2751–52, a "long-languishing" "skeletal building," J.A. 2731, "violat[ing] building code[s]," J.A. 2743, and containing "so many rats" that "it looked like the ground was moving," *id.*—to Dewberry Engineers because the project bore the "Dewberry" name.

Such reputational harm is sufficient to demonstrate irreparable injury flowing from the breach of a settlement agreement restricting the breaching party's use of a trademark. *See, e.g.*, *Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC*, No. 5:15-CV-00058, 2016 WL 1247220 at *28–29 (W.D. Va. Mar. 24, 2016) (collecting cases supporting the proposition that "[l]oss of goodwill and industry reputation can constitute irreparable harm for" both a contract and infringement claim); *see also Worrie v. Boze*, 62 S.E.2d 876 (Va. 1951) (acknowledging irreparable injury may be shown without showing actual damage attendant to the breach of a non-competition agreement). Accordingly, we find no fault with the district court's conclusion that Dewberry Engineers suffered a cognizable injury stemming from Dewberry Group's breach of the CSA.

B.

Dewberry Group also claims that it did not infringe Dewberry Engineers' trademark in violation of the Lanham Act. The Lanham Act protects trademark registrants from "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" by allowing the registrant to commence a civil action against trademark infringers for disgorgement of profits or other damages. 15 U.S.C. § 1114(1). To demonstrate trademark infringement, a plaintiff must show both (1) "that it owns a valid and protectable mark," and (2) "that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006) (quoting § 1114(1)(a)).

The district court entered summary judgment in favor of Dewberry Engineers because it found a likelihood of confusion between Dewberry Engineers' "Dewberry" trademark and Dewberry Group's "Dewberry" branding. But Dewberry Group finds two problems with the district court's analysis. As a threshold matter, Dewberry Group faults the district court for failing to address its defense that it used the "Dewberry" mark prior to Dewberry Engineers' first use. Dewberry Group also disputes the district court's likelihood-of-confusion determination. We ultimately agree with the district court.

1.

We first address Dewberry Group's contention that Dewberry Engineers is not entitled to judgment as a matter of law because Dewberry Group has priority over the "Dewberry" mark.

16

The notion that "federal law does not create trademarks" is a foundational precept of United States trademark law.  *See* 2 J. Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* § 16:18 (5th ed.) (collecting cases).  Instead, "[o]ne who first uses a distinct mark in commerce [] acquires rights to that mark."  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015).  Consequently, the Lanham Act helps to "protect marks" already in use.  *Id.*  To that end, it allows the owner of a trademark to register that mark, granting the registrant substantial benefits.  Registration provides "constructive notice of the registrant's claim of ownership" of the mark, 15 U.S.C. § 1072, and serves as "prima facie evidence of the validity of the registered mark," § 1057(b).  Even more, a mark can become "incontestable" once it has been registered for five years upon the satisfaction of four other criteria.  *See id.* §§ 1065, 1115(b).

Another way the Lanham Act aids trademark registrants is the private right of action it authorizes against alleged infringers.  In an infringement suit involving a mark that has become incontestable, "registration is *conclusive* evidence of the registrant's exclusive right to use the mark, subject to [some] conditions" found in § 15 and "the seven defenses enumerated in § 33(b) itself."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985) (holding that a trademark may not be challenged as merely descriptive once it becomes incontestable); *see also* 15 U.S.C. § 1115(a).  Because a mark ultimately belongs to whomever used it first, "prior use" is one of those enumerated defenses available to defeat a trademark registrant's claim that a mark has become incontestable.  *See* 15 U.S.C. § 1115(b)(5).

When Dewberry Group raised this defense below, the district court responded simply that Dewberry Engineers "established that the 'Dewberry' mark is valid, legally

protected, and, having been in continuous use for more than five years following its registration, incontestable." *Dewberry I*, 2021 WL 5217016, at *6. But it spoke nothing of Dewberry Group's prior use defense, which remains available to refute an incontestable trademark. Dewberry Group now urges reversal because its reading of the record evidence creates a genuine dispute of fact about which party first used the "Dewberry" name.

The district court's silence on the issue notwithstanding, Dewberry Group's priority argument cannot succeed. On its version of the facts, Dewberry Group has long used "Dewberry"—as early as the 1980s—while Dewberry Engineers claimed its first use in 2003. Assured of a competent jury's facility with arithmetic, Dewberry Group contends the prior use question should be reserved for trial. Whatever the merits of this argument, it is foreclosed by a key piece of evidence: paragraph B.8 of the CSA states that Dewberry Group "shall not *challenge* or take action against Dewberry[] [Engineers'] federal trademark registrations." J.A. 1199 (emphasis added). Claiming prior use of a trademark is a challenge against its validity. *See Marcon, Ltd. v. Helena Rubenstein, Inc.*, 694 F.2d 953, 956 (4th Cir. 1982). Dewberry Group thus waived the priority issue when it agreed to the CSA. *See Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328 (6th Cir. 1973) (holding that a prior settlement agreement recognizing the validity of the plaintiff's trademark precluded the defendant's claim that the mark had become descriptive in a later infringement suit as "an attack upon the validity of the trademark").

Dewberry Group pushes back, claiming that a "prior use defense is not a challenge to the validity of Dewberry Engineers' trademark registrations. . . . Rather it is a recognized defense to an infringement action." Reply Br. at 3. In the context of this case, however, that

18

is a distinction without a difference.  The Lanham Act allows litigants to raise prior use either as a ground for cancelation of a registration mark, *Marcon*, 694 F.2d at 956, or as an affirmative defense to infringement of a registered mark, § 1115(b)(5).  Those avenues are distinct to be sure.  Recall, though, that whoever "first uses a distinct mark in commerce [] acquires rights to that mark."  *B & B Hardware, Inc.*, 575 U.S. at 142.  A trademark merely provides prima facie evidence, or conclusive evidence in the case of an incontestable mark, of the mark's "*validity*" and the "registrant's ownership and exclusive right to use the registered mark."  15 U.S.C. § 1115(b) (emphasis added).  And registration is no guarantee of ownership because the validity of even incontestable marks is susceptible to proof of the affirmative defenses found in § 1115(b), one of which is prior use.  So, whether a party claims prior use to preempt the creation of a federal trademark registration, to cancel an existing mark, or in defense of a federal trademark infringement suit, the result is the same: an attack on the validity of that mark.

We therefore need not delve into Dewberry Group's claimed dispute about priority of use.  Dewberry Group may very well have priority over the mark, but it waived its right to assert that claim when it agreed not to challenge Dewberry Engineers' trademark registrations.  Thus, our review yields nothing to disturb the district court's conclusion that Dewberry Engineers' trademark is incontestable.

### 2.

### a.

We now evaluate Dewberry Group's position that disputes of fact remain about whether a likelihood of confusion exists between its own branding and Dewberry

Engineers' "Dewberry" mark. The likelihood of confusion piece to the infringement puzzle is "a matter of varying human reactions to situations incapable of exact appraisement." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (internal quotation marks omitted). Short of an exact measurement of the confusion that may exist between two marks, courts have devised nine factors useful to the analysis: "(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;" "(2) the similarity of the two marks to consumers;" "(3) the similarity of the goods or services that the marks identify;" "(4) the similarity of the facilities used by the [parties];" "(5) the similarity of advertising used by the [parties];" "(6) the defendant's intent;" "(7) actual confusion;" "(8) the quality of the defendant's product;" "and (9) the sophistication of the consuming public." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017).

In considering the question of confusion, it is important to maintain perspective. The above-listed factors are "non-exclusive and non-mandatory," "serve as a guide rather than 'a rigid formula'" and "are not all of equal importance" or "relevant in every case." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 158–59 (4th Cir. 2014) (quoting *George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009)). And, although this element is "frequently a fairly disputed issue of fact on which reasonable minds may differ," *Anheuser-Busch, Inc.*, 962 F.2d at 318, summary judgment can still be appropriate when the record does not create a genuine issue of material fact, *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 375 (4th Cir. 2021) ("Nevertheless, as with any other issue of fact, summary judgment remains appropriate when no jury reasonably could have

20

ruled in the non-moving party's favor.").[1]  Hence, the district court held that Dewberry Engineers is entitled to summary judgment after finding just seven factors relevant but concluding that six supported a likelihood of confusion.  Dewberry Group contests all but one of those six factors.  We consider each in turn.

i.

The first factor the district court considered was the strength or distinctiveness of the Dewberry Engineers' mark as actually used in the marketplace.  This factor is "'paramount' in determining the likelihood of confusion" because consumers are unlikely to associate a weak or undistinctive mark with a unique source "and consequently will not confuse the allegedly infringing mark with the senior mark." *Grayson O*, 856 F.3d at 314–15 (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)).  The mark's overall strength or distinctiveness "comprises both conceptual strength and commercial strength." *Id.* at 315.

"Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical 'peculiarity' of the mark, considered in relation to the product, service, or collective organization to which the mark attaches." *CareFirst*, 434 F.3d at 269 (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).  The mark's

---

[1] *See also*, *CareFirst of Md., Inc.*, 434 F.3d at 274 (affirming summary judgment for the defendant where no factor supported a likelihood of confusion); *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 598–99 (4th Cir. 1992) (affirming summary judgment for defendant because the Court "simply d[id] not believe that there [was] a genuine issue of fact as to whether the public [would] be deceived"); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148–49 (4th Cir. 1987) ("[W]e think that the likelihood of confusion was so unassailably established as to warrant the district court's entry of summary judgment for the plaintiff as to liability.").

"peculiarity" is measured by "placing the mark 'into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful.'" *Grayson O*, 856 F.3d at 315 (quoting *George & Co.*, 575 F.3d at 393–94).

In the proceedings below, Dewberry Group argued that the "Dewberry" mark is conceptually weak because it is a surname, rendering it descriptive. The district court rejected that claim because "[t]aken as a whole, the mark and the 'berry' logo do not suggest a surname." *Dewberry I*, 2021 WL 5217016, at \*7. Instead, it considered the USPTO's decision not to require proof of secondary meaning, indicating that it did not consider the mark descriptive. *Id.* "These facts, read in conjunction with the fact that 'Dewberry' neither suggests nor describes the services provided by [Dewberry Engineers]," the court continued, "lead to the finding that the mark is arbitrary, which is conceptually strong." *Id.*

On appeal, Dewberry Group asserts that the district court made short shrift of its argument that the surname "Dewberry" weakens the distinctiveness of the "Dewberry" mark. It contends that "[s]urnames are never assumed to be 'distinctive'" and courts are loath to constrain and "to prohibit an individual from use of his or her name in commerce." Opening Br. at 29 (citing *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 984 (2d Cir. 1942)).

Dewberry Group's surname argument is unpersuasive. For one, it does not meaningfully dispute the district court's reasoning that "Dewberry" does not suggest or describe the services provided by Dewberry Engineers. And, given that "Dewberry" plainly may refer to fruit, it is an arbitrary mark, much like "Apple computers" refers both to a fruit and a consumer computer products company without *describing* the company's

22

services or products.  *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996) ("Examples [of arbitrary marks] include Tea Rose® flour, Camel® cigarettes, and Apple® computers.").  It is also undisputed that, as the district court noted, the USPTO did not require proof of secondary meaning when it registered Dewberry Engineers' "Dewberry" mark, as would be required for a descriptive mark.  *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 936 n.15 (4th Cir. 1995) ("The fact that the Trademark Office did not require proof of secondary meaning can be determined from analyzing a title copy of the registration the Office issued.").  So, the district court did not merely "assume" the "Dewberry" mark's distinctiveness as a surname; it made its distinctiveness determination based on uncontroverted evidence in the record.

Additional record facts only bolster the district court's conclusion.  For instance, Dewberry Engineers offered branding studies indicating that consumers in the real estate industry "refer to [Dewberry Engineers] simply as 'Dewberry'" and associate the mark with "knowledge, quality and strong client service."  J.A. 7743.  A branding awareness study can be an effective yardstick for determining a mark's distinctiveness.  *See, e.g.*, *Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 1355 (Fed. Cir. 2011) (considering "corporate studies tracking awareness of the CITIBANK mark").  Dewberry Group's only response to this evidence is a naked assertion that "a factfinder may reject such studies."  Reply Br. at 7.  Speculation does not create a genuine dispute of fact, however.  Without evidence to the contrary, the record supports the district court's finding that the mark is distinctive and that this factor favors Dewberry Engineers.

23

ii.

Turning to the similarity of the marks, the district court found that "the parties' marks share the same dominant and distinctive term: 'Dewberry'" and found "[t]he addition of the generic terms (e.g. 'group,' 'Studio,' 'Office,' etc.)" to Dewberry Group's new marks irrelevant. *Dewberry I*, 2021 WL 5217016, at *7. Dewberry Group offers a different analysis. In its view, "the marks in fact have different connotations" because Dewberry Engineers' "Dewberry" mark and design refers to a fruit while its own mark refers to its owner, John Dewberry. Opening Br. at 31. We disagree.

"[I]n evaluating the similarity of two marks, . . . the marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." *Lone Star Steakhouse*, 43 F.3d at 936. The dominant portion of a trademark—that is, "whatever is most noticeable in actual conditions"—receives "more weight when assessing similarity because consumers are more likely to confuse marks with dominant similar features than marks with less noticeable similar features." *Grayson O*, 856 F.3d at 317. But courts "need not engage in a technical dissection" of the marks, because consumers "typically do not engage in" such "nuanced, piecemeal comparison[s]." *Id.*

The application of those principles to this case is straightforward. The parties' marks feature the word "Dewberry" in conjunction with other, more generic prefixes and suffixes (e.g., Dewberry "Engineers" versus Dewberry "Group" and "Studio" Dewberry). The district court was correct to isolate "Dewberry" as the dominant word. When Dewberry Group sought registration of its rebranded marks, like "Dewberry Living" and "Studio Dewberry," the USPTO required it to disclaim the right to the descriptive terms

24

"Studio" and "Living," leaving "Dewberry" as the only distinctive element in both parties'
marks. *See Pizzeria Uno*, 747 F.2d at 1529–30 (observing that where a mark consists of
more than one word, the word which is not disclaimed is the dominant term); *see also In
re Dixie Rests. Inc.*, 105 F.3d 1405, 1407 (Fed. Cir. 1997) (finding "delta" the dominant
part of the mark "THE DELTA CAFÉ because CAFÉ was disclaimed").  The dominant
term in the parties' marks is thus identical.  "This identity of the dominant term in both
marks is a strong indicator of that similarity in appearance and sound which would result
in confusion." *Pizzeria Uno Corp.*, 747 F.2d at 1534.  Therefore, the record does not
support a genuine dispute that the marks are similar.

iii.

The district court also found the services that the marks identify sufficiently similar.
*Dewberry I*, 2021 WL 5217016, at *8.  Dewberry Group contests this conclusion, too,
quibbling this time with the district court's focus on "the words listed in Dewberry Engineers'
trademark registrations."  Opening Br. at 32.  Had the district court looked elsewhere,
Dewberry Group contends, it would have gleaned from the record that Dewberry Engineers
provides architectural and engineering services on a wholly different level of the broad real
estate market than Dewberry Group's real estate development business.

"With regard to this element, the products [and services] in question need not be
identical or in direct competition with each other.  Because confusion may arise even where
products are merely 'related,' the court is to consider 'whether the public is likely to
attribute the products and services to a single source.'" *Renaissance Greeting Cards, Inc.*

25

*v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 244 (4th Cir. 2007) (unpublished) (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001)).

Dewberry Group is right to frame the question here as one about how the marks are used in the marketplace for their services. But, on that score, there is plenty of evidence demonstrating both parties' use of their "Dewberry" marks in related ways to generate real estate development business. Dewberry Group concedes its stake in the commercial real estate market. Dewberry Engineers, in comparison, competes no less in the real estate development services industry. Take, for example, the testimony of Joanna Legarreta, the director of real estate services for Providence Corporation. She testified that Providence Corporation does business as "Dewberry Real Estate Services" and provides services, such as "obtaining financing for property acquisition and construction" and "negotiating and arranging for the acquisition of property for development purpose," on behalf of Dewberry Engineers. J.A. 2829. Consider also John Dewberry's suggestion to Sid Dewberry, a co-founder of Dewberry Engineers, that their two companies enter a partnership developing a real estate project in Virginia. This record evidence points not only to the relatedness of the parties' services, but to their relationship as complementary services as well. *See Comms. Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970) ("Complementary products, or services, are particularly vulnerable to confusion.").

iv.

The district court also evaluated the similarity of the parties' advertising. For this inquiry, a court may consider "[(1)] the media used, [(2)] the geographic areas in which advertising occurs, [(3)] the appearance of the advertisements, . . . [(4)] the content of the

advertisements" and (5) the amount of advertising between the plaintiff and defendant. *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 667 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017). The district court concluded this factor favored a likelihood of confusion given that both companies market their services in Virginia, Florida, and Georgia; and "both parties promote their architectural and interior design services in *Architectural Record* magazine." *Dewberry I*, 2021 WL 5217016, at *8. Dewberry Group disputes this factor, arguing that the *Architectural Record* reference was to an article written about its hotel, not a solicited advertisement.

Putting the *Architectural Record* magazine dispute aside, the parties' advertisements appear in overlapping geographical areas. Dewberry Engineers and Dewberry Group display their marks on website designs, leasing signage, leasing packages, and letterhead. And as the district court noted, each markets its respective brands in Virginia, Florida, and Georgia. That evidence also favors a likelihood of confusion.

Dewberry Group retorts that a genuine dispute exists because Dewberry Engineers uses social media to advertise its real estate services, while Dewberry Group does not. That Dewberry Engineers also markets on social media is not enough to create a genuine dispute. A disparity in the amount of advertising done by one party as compared to the other certainly may indicate dissimilarity in advertising. *See CareFirst*, 434 F.3d at 273 (noting that advertising was dissimilar where one party "spends less than $2,000 per year on advertising" and the other "spends millions of dollars every year"). But the fact that Dewberry Engineers advertises on social media does not indicate that it spends significantly more money on its advertising efforts than Dewberry Group. And considering the parties' disparate use of

social media in comparison with the record evidence that each party markets in similar ways and in overlapping markets, at most this factor neither favors nor disfavors Dewberry Engineers' claim of confusion.

v.

The district court next found an intent to confuse or infringe. Intent may be inferred from the junior user's knowledge of the senior user's mark. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 665 (4th Cir. 2018) (citation omitted). Following that reasoning the district court found that Dewberry Group not only knew of Dewberry Engineers' mark, but entered the CSA and then breached it in favor of its "rebranding" efforts, which re-purposed Dewberry Engineers' "Dewberry" mark. *Dewberry I*, 2021 WL 5217016, at *8. In view of these details, the court held this factor also "favors a finding of a likelihood of confusion." *Id.*

Dewberry Group advances two unpersuasive arguments why it believes the district court erred. It first contends that the district court did not construe the CSA drawing inferences in its favor. By Dewberry Group's reading, the CSA allows it to use other "Dewberry" marks because paragraph B.3 merely *permits* Dewberry Group to use the "Dewberry Capital" mark in connection with its real estate development business—it does not *proscribe* the use of other "Dewberry" marks. But we read the CSA as more restrictive than that. Elsewhere in the CSA, it ensures the priority of Dewberry Engineers' "Dewberry" trademark by eliminating Dewberry Group's ability to claim the right to use "Dewberry" beyond the permission expressed therein. And the CSA restricts Dewberry Group's use of "Dewberry" to the "Dewberry Capital" mark to real estate development

28

services outside of Virginia, D.C., and Maryland.[2]  When conducting business inside one of those three locations, Dewberry Group must use the "DCC" mark.  None of that language strikes us as offering Dewberry Group free rein to use "Dewberry" as it pleases.  To conclude otherwise would undermine the very purpose behind the CSA to settle Dewberry Engineers' prior claim that Dewberry group infringed its federal "Dewberry" trademark.  *See Pocahontas Min. LLC v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008) ("A court's primary focus in considering disputed contractual language is to determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in their agreement.").

Second, Dewberry Group argues that its decision to engage in a trademark search prior to its name change is evidence of a genuine dispute about its intent.  That evidence might lead to a reasonable inference of good faith had the parties not previously litigated these same issues and signed a CSA outlining Dewberry Engineers' right to its "Dewberry" trademark.  On this record, however, Dewberry Group's breach of the CSA is compelling evidence of its intent to confuse and a strong indication that there is a likelihood of confusion.  *See Pizzeria Uno Corp.*, 747 F.2d at 1535 ("If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from

---

[2] This point also undermines Dewberry Group's claim that the district court gave no consideration to "Dewberry Engineers' explicit consent" in the CSA to Dewberry Group's use of the "Dewberry Capital" mark.  Opening Br. at 27.  Dewberry Engineers' "consent" was limited in scope.  Whatever influence this isolated provision of the CSA has on this litigation, it cannot overcome the great weight of evidence favoring likelihood of confusion.

another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion.").

### vi.

Finally, the district court was persuaded by the evidence of actual confusion in this case. The district court credited Dewberry Engineers' evidence of actual confusion: an expert survey finding that at least twenty percent of respondents confused "Dewberry Group" for "Dewberry Engineers" and specific instances where representatives from Dewberry Engineers' client, the University of Virginia, confused Dewberry Group for Dewberry Engineers. *Dewberry I*, 2021 WL 5217016, at *9. Because Dewberry Group rebutted that evidence only with immaterial distinctions rather than evidence of no confusion, the district court sided with Dewberry Engineers on this factor. We agree with the district court.

Although "[i]t is well established that no actual confusion is required to prove a case of trademark infringement," its presence "can be persuasive evidence relating to a likelihood of confusion." *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007). Conversely, "the absence of any evidence of actual confusion over a substantial period of time . . . creates a strong inference that there is no likelihood of confusion." *CareFirst*, 434 F.3d at 269. Actual confusion can be shown through survey evidence. *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 661 (4th Cir. 1996).

On appeal, Dewberry Group reiterates its arguments below: each instance of confusion occurred prior to its rebrand and Dewberry Engineers never raised an issue of actual confusion before instituting this action, as required by the CSA. We reject both claims as the district court did. First, as the court noted, whether the actual confusion occurred before or after the

rebrand does not meaningfully impact its relevance to this inquiry. If anything, the fact that Dewberry Engineers' clients confused the two *before* Dewberry Group rebranded would suggest that introducing more names using the "Dewberry" mark would lead to more confusion. Second, while in theory the fact that Dewberry Engineers never raised the issue of actual confusion with Dewberry Group might suggest an inference that none existed, it does not erase the actual instances of confusion in the record. Finally, even putting those points aside for the sake of considering facts in a light favorable to Dewberry Group,[3] Dewberry Group still does not rebut Dewberry Engineers' survey evidence showing at least a twenty percent actual confusion rate, which alone serves as "clear evidence of actual confusion for purposes of summary judgment." *RXD Media, LLC*, 986 F.3d at 373 (a "confusion rate of 17 percent" is "clear evidence"). Thus, there is no genuine dispute on this factor.

b.

After considering these factors, the district court held that there was a likelihood of confusion between the parties' marks, even while acknowledging that they deal with sophisticated consumers. *Dewberry I*, 2021 WL 5217016, at *10. We agree. The parties share an identical, arbitrary dominant word and disclaim different suffixes (and prefixes in some cases) in the marks at issue. The record shows they also employ those marks in related, overlapping, and complementary services. Those details go some distance toward creating a

---

[3] That said, there are more instances in the record. *See*, *e.g.*, J.A. 2725–29 (A businesswoman demanded compensation from Dewberry Engineers for injuries sustained at Dewberry Group's property); J.A. 2723–24 (A rental business contacted Dewberry Engineers about Dewberry Group's failure to pay a bill).

likelihood of confusion as to the origin of either party's "Dewberry" mark. *See Pizzeria Uno Corp.*, 747 F.2d at 1530 (observing that where the dominant word is suggestive and is identical except for a different prefix in the challenged mark, there is sufficient similarity to create a likelihood of confusion if the products involved belong to the same general service); *see also Am. Throwing Co. v. Famous Bathrobe Co.*, 250 F.2d 377, 381 (CCPA 1957) (suggesting the same reasoning applies to arbitrary marks).

There is more yet. In this case, "public confusion will adversely affect [Dewberry Engineers'] ability to control [its] reputation among its laborers, lenders, investors, or other group[s] with whom [Dewberry Engineers] interacts." *Perini Corp.*, 915 F.2d at 128. In fact, the evidence suggests it already has. That much is clear from the brand confusion survey Dewberry Group did not contest below, or the uncontroverted instances of actual confusion among the public and Dewberry Engineers' own client. And we may infer intent to create all this confusion from Dewberry Group's brazen attempt to revamp its brand using "Dewberry" variations in geographic areas prohibited by the CSA. Even drawing reasonable inferences in Dewberry Group's favor, it offers too few record facts among its many arguments to undermine the evidence of confusion gathered by the district court. In other words, "no jury reasonably could have ruled" in Dewberry Group's favor. *RXD Media, LLC*, 986 F.3d at 375.

\*    \*    \*

Because Dewberry Group does not offer persuasive arguments or record evidence to surmount the district court's analysis, we affirm the district court's finding of trademark infringement.

32

III.

Failing on the merits, Dewberry Group falls back on its objections to the remedies Dewberry Engineers received as compensation for Dewberry Group's infringement. The district court permanently enjoined Dewberry Group from using the "Dewberry" mark except in the manner permitted by the CSA. In addition, the district court ordered Dewberry Group to disgorge the $43 million of its profits that stemmed from Dewberry Group's infringing activity. Then, the court awarded Dewberry Engineers reasonable attorneys' fees and costs as authorized by the Lanham Act. We review those decisions for an "abuse of discretion, accepting the court's factual findings absent clear error, while examining issues of law de novo." *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002).

A.

Our review of the remedies the district court granted starts with its injunction order. The Lanham Act vests courts with the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent" trademark infringement. 15 U.S.C. § 1116(a). In fact, we have held that an injunction is "the preferred remedy" for such infringements. *Lone Star Steakhouse*, 43 F.3d at 939 (citation omitted).

Because the district court found that Dewberry Group infringed Dewberry Engineers' "Dewberry" mark and breached its contract, it entered a permanent injunction order. It enjoined Dewberry Group from use of the "Dewberry" "name or mark" or "any name or mark" incorporating "Dewberry" "on or in connection with any real estate-related products or services, including but not limited to leasing of real estate, real estate investment, real estate management, real estate development, real estate site selection, architectural services, interior

33

design and engineering services" except as already permitted by the CSA. *Dewberry III*, 2022 WL 1439105, at *5. This language, in Dewberry Group's view, is overly restrictive because it "essentially precludes Mr. Dewberry from using his surname in his commercial real estate development businesses." Opening Br. at 51. We do not share that view.

It is well-understood that "injunctive relief must not extend beyond the threatened injury." *Catalog Mktg. Servs., Ltd. v. Savitch*, 873 F.2d 1438 (4th Cir. 1989) (unpublished table opinion). And Dewberry Group is correct that courts are "reluctan[t]" to prevent individuals from using their own names in business. *See e.g., E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 (9th Cir. 1992). But the injunction language, read in context, merely enjoins Dewberry Group from violating the terms of the CSA to which it previously agreed. It does not, as Dewberry Group suggests, command it in terms beyond the scope of the CSA. And to the extent Dewberry Group finds the district court's order ambiguous, it "can always seek clarification or modification of the decree from the district court." *United States v. Apex Oil Co.*, 579 F.3d 734, 740 (7th Cir. 2009).

## B.

### 1.

We decide next whether the district court erred in awarding disgorgement profits to Dewberry Engineers. In a successful trademark infringement action, the Lanham Act entitles a plaintiff "to recover (1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Further:

> The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or

deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages. . . . If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

*Id.*

We have outlined six equitable factors for district courts to consider in connection with the disgorgement-of-profits remedy for infringement under 15 U.S.C. § 1117(a). These factors are: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Synergistic Int'l,* 470 F.3d at 175.

There is no disagreement in this case that we confront a record lacking in evidence of diverted sales[4] or palming off.[5] Even still, the district court ordered disgorgement. With respect to Dewberry Group's intent to confuse or deceive, the district court observed that Dewberry Group pursued its infringing activities despite several "red flags" cautioning against its conduct. *Dewberry II*, 2022 WL 1439826, at *8. These red flags ranged from

---

[4] Without evidence of lost profits by Dewberry Engineers through diverted sales, Dewberry Group contends the disgorgement award does nothing but "punish [it] for supposedly misinterpreting both the Coexistence Agreement [i.e., the CSA] and the ability of a John Dewberry company to utilize his surname." Reply Br. at 17. Because this contention merely rehashes its failed merits argument that Dewberry Group did not breach the CSA, we are satisfied to reject it.

[5] Palming off "involves the issue of whether the defendant used its infringement of the plaintiff's mark to sell its products, misrepresenting to the public that the defendant's products were really those of the plaintiff." *Synergistic Int'l*, 470 F.3d at 176.

Dewberry Group's own admissions prior to the CSA that the marks are confusingly similar, the CSA's terms, Dewberry Engineers' cease-and-desist letters, and the USPTO's denial of the "Dewberry Group" registration application. *Id.* at *2–4. We share the court's conclusion that Dewberry Group's conduct leaves little doubt of its intent to deceive. And, although Dewberry Engineers did not produce evidence of lost sales resulting from Dewberry Group's infringement, that factor still weighs in favor of disgorgement because "the parties operate in overlapping markets" and "market to the same kinds of parties." *Id.* at *8 (citation omitted).

Also favoring disgorgement is the need to compensate Dewberry Engineers for the damage to its "positive reputation" and the dilution of "its significant investment in its brand." *Id.* And because the injunction the district court entered would address only future infringement, we agree with the district court's reasoning that profit disgorgement is necessary to make Dewberry Engineers whole for the damage already done. *Id.* Finally, given the instances of actual consumer confusion in the record, the district court concluded that the public interest in making Dewberry Group's misconduct unprofitable favors disgorgement. *Id.* at *9. Taking these factors together, the district court found profit disgorgement appropriate. We share that sentiment and discern no error so far.

Once it decided to disgorge profits, the district court needed to determine how much Dewberry Group profited from its infringing activities. The parties disagreed about which revenues belonged in this calculation in the proceedings below and again on appeal. The core dispute stems from Dewberry Group's relationship with its affiliates. According to Dewberry Group, it does not actually provide infringing services to third parties for a profit. Instead, it produces infringing branding for its affiliates, who in turn generate profits using

36

that branding on their lease, loan, and other promotional materials. Due to this arrangement, Dewberry Group presented evidence that it "generated zero profits because the Dewberry Group, Inc. tax entity showed losses on its tax returns." *Id.* And while Dewberry Group conceded that it is responsible for the accounting and cash management for each of its affiliates, it argued "that it is not the 'economic engine that creates the revenue that flows'" to them. *Id.* (cleaned up).

On the other hand, Dewberry Engineers' expert, Rodney Bosco, testified that "Dewberry Group's real estate business is structured so that it and its employees promoted, managed, and operated all of the properties owned by the [affiliates], and did so using the Infringing Marks." *Id.* The district court observed that Dewberry Group's Executive Vice President of Finance "provided testimony consistent with Bosco's conclusions." *Id.*

Persuaded by Dewberry Engineers' position, the district court treated Dewberry Group and its affiliates as a single corporate entity for the purpose of calculating revenues generated by Dewberry Group's use of infringing marks. *Id.* at *10. In addition to weighing the expert testimony, the district court reasoned that "even though the [affiliates] do not and cannot perform the work and services necessary to generate revenues (but for limited exceptions at the hotel), all revenues generated through Dewberry Group, Inc.'s services show up exclusively on the [affiliates'] books." *Id.* at *9. Moreover, given that John Dewberry has contributed at least $23 million to cover Dewberry Group's extensive losses over the past thirty years, the court determined that the tax information showing only losses does not reflect the "economic reality" of Dewberry Group's relationship with its affiliates. *Id.* at *10

After Dewberry Engineers established Dewberry Group's infringing revenues, the burden shifted to Dewberry Group to present revenues unrelated to the infringement and the costs that should be deducted. *See* 15 U.S.C. § 1117(a). Dewberry Group met that burden only as to one of those categories. The district court reduced Dewberry Engineers' requested award of $53,719,657 to reflect Dewberry Group's evidence that some leases pre-dated the use of the infringing marks and that "Dewberry Engineers did not allege that the use of THE DEWBERRY® [hotel] for hospitality services is an infringement." *Dewberry II*, 2022 WL 1439826, at *13. Despite Dewberry Group's failure to calculate exact figures or provide evidence of deductions from infringement revenues for losses and expenses, the court equitably reduced the requested award by twenty percent, to $42,975,725.60. *Id.* at *13–14. We find no error of fact or law suggesting the district court's conclusions were an abuse of its discretion.

2.

Disagreeing with our view, Dewberry Group raises several problems it considers fatal to the district court's analysis. Yet none displace our conclusions.

Dewberry Group first questions the propriety of profit disgorgement considering, as it sees things, there was no evidence in the record of an intent to deceive. It cites *CareFirst*, for the proposition that an intent to deceive requires evidence of an "inten[t] to capitalize on the good will associated with the senior user's mark." 434 F.3d at 273. In *CareFirst*, the plaintiff argued that the defendant's "First Care" mark infringed its own "CareFirst" mark. *Id.* at 266. The plaintiff further claimed that the defendant's infringement amounted to bad faith, evidenced by the defendant's application for a state registration of its allegedly infringing mark a month after the plaintiff sued the defendant. *Id.* Rejecting that position, we held that

38

"[t]he fact of the state application, in and of itself, simply does not show an intent to capitalize on the good will associated with CareFirst's mark." *Id.* Without more, we declined to "infer from this mere filing for state registration that First Care intended to capitalize on CareFirst's good will when this action would have done nothing to achieve that purpose." *Id.*

Our *CareFirst* decision is too factually dissimilar to this case to undermine the district court's finding that Dewberry Group intended to deceive the public. Unlike the state trademark application in *CareFirst*, the federal trademark applications Dewberry Group filed are not the only indicia of its bad faith. Before Dewberry Group decided to rebrand from Dewberry Capital, its general counsel performed a trademark search, but John Dewberry did not inform him of the CSA. Then, Dewberry Engineers sent Dewberry Group multiple cease-and-desist letters demanding Dewberry Group's compliance with the CSA and raising anecdotal instances of actual confusion between their marks. Dewberry Group still pressed forward with its activities. Even the USPTO warned Dewberry Group that its sought-after marks resembled Dewberry Engineers' mark. What's more, there is evidence in the record that John Dewberry attempted to purchase Dewberry Engineers and suggested the two companies work together on a business venture. These facts suggest that Dewberry Group intended to use the "Dewberry" mark variants to rebrand and generate business for itself. Taken together, they support the district court's finding that Dewberry Group willfully infringed by using its rebranded "Dewberry" marks.

Dewberry Group also contends that the district court abused its discretion because it ignored evidence that the fees Dewberry Group earned were not attributable to the infringing marks. That criticism ignores the fact that the district court *did* consider

Dewberry Group's evidence.  The court detailed the opinions of Dewberry Group's expert witness, Lisa Miller, that "market factors" rather than brand recognition, drive a commercial tenant's decision to lease commercial property.  *Dewberry II*, 2022 WL 1439826, at *11.  It also mentioned that many Dewberry Group revenue streams came from prior existing leases.  *Id.* at *12.  But Dewberry Engineers' expert, Bosco, also opined that all the pre-existing leases used the infringing "Dewberry" marks, which could have contributed to their renewal or maintenance of the pre-infringement revenues.  He further criticized Miller for failing to provide any basis for her conclusion that the infringing marks could not have contributed to the maintenance of pre-infringement revenue streams.  Weighing Miller's testimony against Bosco's competing statements, the district court found Bosco's evidence more convincing.

There is more to Dewberry Group's concerns about Dewberry Engineers' disgorgement evidence, though.  Dewberry Group posits that Bosco's testimony could not prove a connection between its infringing conduct and the revenues of its affiliates that used the infringing materials.  A "plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).  But Dewberry Group did not carry its burden to demonstrate that its profits were not so attributable, which is a question of fact to be determined by the district court and reviewed by this Court for clear error.  *See Morris v. Wachovia Secs., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006).  Given Bosco's opinion that Miller did nothing to clearly demonstrate that there was no

connection between the infringing materials and its revenues, the district court's factual finding that there was such a connection is not clearly erroneous.

Advancing a related critique, Dewberry Group asserts the district court failed to appreciate the corporate distinctions between Dewberry Group and its affiliates by piercing their corporate veils. But we view the district court's decision differently. Rather than pierce the corporate veil, the court considered the revenues of entities under common ownership with Dewberry Group in calculating Dewberry Group's true financial gain from its infringing activities that necessarily involved those affiliates. Dewberry Group argued below that its tax structure is such that it does not generate revenues from the real estate development efforts of its affiliates. Instead, it provides its affiliates with the infringing promotion materials, the affiliates engage in business using those materials, and then the affiliates pay Dewberry Group a fee for this internal service.

The district court relied on the Fifth Circuit's holding in *American Rice, Inc. v. Producers Rice Mill, Inc.* that the tax treatment of a corporate entity's infringing behavior is not a barrier to profit disgorgement. 518 F.3d 321, 340 (5th Cir. 2008). There, the defendant argued that the district court erred in considering profits that the defendant did not retain due to the nature of its business. *Id.* at 338. The plaintiff argued that the defendant's business structure was irrelevant to its disgorgement obligations as infringers, and the court agreed. *Id.* at 339. The Fifth Circuit found that the defendant clearly earned a profit on its sales, and that it passed those profits on to its patrons. *Id.* "The 'flow-through' of the profits to the farmers," it reasoned, "is certainly relevant to how [the defendant] is treated for tax purposes; however, [the defendant] cites no authority for the proposition that tax treatment is relevant to the

41

Lanham Act remedies." *Id.* The court therefore held that "profits earned by [the defendant] are [the defendant's] profits for purposes of the Lanham Act, regardless of how such profits are passed on or how they are taxed." *Id.* at 340.

Dewberry Group protests the district court's reliance on *American Rice* because the defendant in that case earned a profit directly from the unlawful practices, and simply passed the profit off to another entity. In contrast, Dewberry Group never held any direct profits from its affiliates' uses of the infringing materials. While we recognize that distinction, we find *American Rice* more illuminating than distinguishable. Dewberry Group admits that it operates as a corporate shared-services entity under common, exclusive ownership with its affiliates. It provides financial accounting, human resources, legal services, and—of course—the infringing marks to those affiliates and their shared owner, John Dewberry. The affiliates then lease commercial property to commercial tenants for a profit using those marks. So, while Dewberry Group did not receive the revenues from its infringing behavior directly, it still *benefited* from its infringing relationship with its affiliates—just as the defendant in *American Rice* still benefited from its relationship with the farmers who received its passed-off infringement profits.

A district court's grant of profit disgorgement is "subject to the principles of equity," 15 U.S.C. § 1117(a), and is ultimately a matter of the court's discretion, *Synergistic Int'l*, 470 F.3d at 176. The district court here "weigh[ed] the equities of the dispute and exercise[d] its discretion" to hold Dewberry Group to account for the revenues generated in part from infringing materials used by its affiliates under common ownership. *Id.* Admonishing courts for using their discretion in this fashion risks handing potential trademark infringers the blueprint for using

corporate formalities to insulate their infringement from financial consequences. That, of course, runs counter to Congress's fundamental desire to give trademark registrants under the Lanham Act "the greatest protection that can be given them." *Park 'N Fly, Inc.*, 469 U.S. at 193; *see also Am. Rice*, 518 F.3d at 340 (noting that "[t]he purpose of section 1117 is to take all the economic incentive out of trademark infringement").

In its remaining challenge to the disgorgement award, Dewberry Group claims that the district court's calculations were speculative and did not account for costs. To calculate the disgorgement award, the district court started with a "conservative" estimate of the revenues Bosco calculated for the infringement period, then it subtracted twenty percent from that number to account for pre-existing leases and revenues that theoretically might not have had any relation to the infringing activities. *Dewberry II*, 2022 WL 1439826, at *11–13. Any arbitrariness in that figure can be traced back to Dewberry Group's litigation strategy to deny *any* connection between its affiliates' revenues and its infringing marks. Dewberry Group offered *no* calculations for costs, nor did it provide calculations reflecting the distinction between infringing and non-infringing revenues. It was Dewberry Group's burden to provide this evidence, and we will not now fault the district court for the approximations it was forced to make.

In sum, we hold that the district court did not abuse its discretion in finding profit disgorgement appropriate in this case or in its disgorgement calculations.

## C.

Finally, we evaluate the district court's decision to award attorneys' fees to Dewberry Engineers. In "exceptional cases" of federal trademark infringement, the

43

prevailing party may be entitled to reasonable attorneys' fees. 15 U.S.C. § 1117(a). The district court considered this an exceptional case because it found "beyond a preponderance of the evidence that Dewberry Group engaged in bad faith, intentional misconduct." *Dewberry II*, 2022 WL 1439826, at *14. Dewberry Group argues that the district court misapplied the law because it did not consider whether "there is an unusual discrepancy in the merits of the positions taken by the parties, based on the non-prevailing party's position as either frivolous or objectively unreasonable" or whether "the non-prevailing party has litigated the case in an unreasonable manner." Opening Br. at 56 (citing *Verisign, Inc. v. XYZ.COM LLC*, 891 F.3d 483–84 (4th Cir. 2018)). But Dewberry Group's argument misinterprets the upshot of *Verisign*.

In *Verisign*, the Court held that "a prevailing party need only prove an exceptional case by a preponderance of the evidence" and clarified that "a prevailing party need not establish that the losing party acted in bad faith in order to prove an exceptional case." 891 F.3d at 482. It emphasized a prevailing party can prove an "exceptional case" by demonstrating that "there is an unusual discrepancy in the merits of the positions taken by the parties, based on the non-prevailing party's position as either frivolous or objectively unreasonable," that "the non-prevailing party has litigated the case in an unreasonable manner," *or* that "there is otherwise the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 483–84.

That language is disjunctive, not conjunctive. So, while the test includes the factors Dewberry Group points to, it does not require a prevailing party to demonstrate the presence of *all three* circumstances. The *Verisign* test instead draws from the Supreme

Court's "nonexclusive list of factors" for use in determining whether to award attorneys' fees under a similar provision of the Copyright Act. *See Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 719–21 (4th Cir. 2015) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 & n.6 (2014)).  And, as the third factor of the *Verisign* test suggests, district courts are not constrained to follow a "precise rule or formula for making these determinations but instead equitable discretion should be exercised." *See Octane Fitness*, 572 U.S. at 554 (cleaned up) (rejecting Federal Circuit's attorneys' fees rule as "overly rigid").

Given the district court's findings that Dewberry Group "pervasively breached the CSA over Dewberry Engineers' objection, in contravention of its General Counsel's false assurances, and in the face of multiple red flags, which were cited by the Court on summary judgment," it found the award of attorneys' fees appropriate. *Dewberry II*, 2022 WL 1439826, at *14.  It is clear to us that the district court awarded fees in its equitable discretion under the "particular circumstances to advance considerations of compensation and deterrence." *Verisign*, at 484.  We find no error in its judgment.

IV.

After conducting a de novo review of the district court's summary judgment determination and finding no abuses of discretion in its awarded remedies, we affirm.

*AFFIRMED*

45

QUATTLEBAUM, Circuit Judge, concurring in part[1] and dissenting in part:

I disagree with the majority on two issues related to Dewberry Engineers' trademark infringement claim. First, it should be for the jury, not a judge, to decide whether the trademark is likely to create confusion. That element of Dewberry Engineers' claim is inherently fact-based and, under the record here, genuine disputes of material fact remain. And as a result, I would vacate the district court's order awarding Dewberry Engineers summary judgment along with the order awarding damages.

Second, even were summary judgment appropriate, the district court improperly awarded disgorgement of profits damages. The Lanham Act permits, under certain circumstances, a party that proves trademark infringement to recover the infringer's profits as damages. But in calculating those profits here, the district court added the profits of companies who—although affiliated with the Dewberry Group—are separate entities and not named defendants. That was improper. So even were Dewberry Engineers entitled to summary judgment, I would vacate the damages award and send it back for the district court to redo it.[2]

---

[1] I join Part II—A of the majority opinion affirming the district court's order of summary judgment on Dewberry Engineers' breach of contract claim and Part II—B—1 of the majority opinion affirming the district court's rejection of the Dewberry Group's priority of use defense to Dewberry Engineers' trademark infringement claim.

[2] Since I would send the issue of likelihood of confusion to the jury, I would vacate the district court's damages award in its entirety. But were summary judgment on the trademark infringement claim appropriate, I would join the majority opinion in Part III—A affirming the district court's order for injunction damages, Part III—B—1 affirming the district court's decision that Dewberry Engineers is entitled to disgorgement of profits damages and Part III—C affirming the district court's award of attorney's fees. Like the majority, I find no abuse of discretion as to those issues.

I.

Liability for a Lanham Act violation requires, among other things, a finding of likelihood of confusion between the owner of a protected mark and the alleged infringer's mark. *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006). We have established the following nine, non-exhaustive factors to consider in evaluating likelihood of confusion:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012) (quoting *George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009)).

These non-exhaustive factors cannot be applied formulaically. *George & Co., LLC*, 575 F.3d at 393. And the factors "are [not all] of equal importance." *Id*. Given the test's flexibility, it is not surprising that likelihood of confusion is "frequently a fairly disputed issue of fact on which reasonable minds may differ." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018) (quoting *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992)). In fact

> This pivotal trademark issue is particularly amenable to resolution by a jury for two reasons. First, the jury, which represents a cross-section of consumers, is well-suited to evaluating whether an ordinary consumer would likely be confused. Second, the likelihood of consumer confusion is an inherently factual issue that depends on the unique facts and circumstances of each case. Likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ and has long been recognized to

47

be a matter of varying human reactions to situations incapable of exact appraisement.

*Anheuser-Busch,* 962 F.2d at 318 (cleaned up).

Contrary to the conclusions of the district court and the majority, a jury—and not the court—should decide likelihood of confusion here. I agree that the similarity of the marks and the intent to infringe factors suggest a likelihood of confusion. And while the evidence of actual confusion is scant, what little exists favors finding a likelihood of confusion.[3] But in granting summary judgment, the district court concluded that the strength of the mark, the services the mark identifies, the similarity of advertising and the sophistication of Dewberry Engineers' customers all support finding a likelihood of confusion. I disagree. As shown below, when the evidence is construed in the light most favorable to the Dewberry Group, as it must be at the summary judgment stage, there are genuine disputes of material fact on these issues as well as on the overall consideration of the likelihood of confusion factors. The jury—not the court—should decide whether there is a likelihood of confusion between the parties' marks.

A.

First, the strength of Dewberry Engineers' mark. This factor is "paramount in determining the likelihood of confusion since a consumer is unlikely to associate a weak or undistinctive mark with a unique source and consequently will not confuse the allegedly infringing mark with the senior mark." *Variety Stores, Inc.*, 888 F.3d at 661 (cleaned up).

---

[3] I also agree with the district court that the similarity of facilities and the quality of the Dewberry Group's products are not applicable here.

48

The key issue in the analysis of this factor is whether Dewberry Engineers' "Dewberry" mark is based on a surname or not. Surnames are descriptive marks[4], which "are not inherently distinctive" and "are accorded protection only if they have acquired a 'secondary meaning.'" *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 315 (4th Cir. 2017) (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996)).

The district court held that this factor favored a likelihood of confusion because, "[t]aken as a whole, the mark and the 'berry' logo do not suggest a surname." *Dewberry Eng'rs, Inc. v. Dewberry Grp., Inc.* (*Dewberry I*), No. 20-cv-00610, 2021 WL 5217016 (E.D. Va. Aug. 11, 2021). It relied on the fact that the United States Patent and Trademark Office did not require proof of a secondary meaning which it requires for a descriptive mark and that "'Dewberry' neither suggests nor describes" Dewberry Engineers' services. *Id.* I agree there is some evidence in the record supporting the conclusion that "Dewberry" does not suggest a surname. But there is certainly evidence in the record that it does.

For starters, the founder of Dewberry Engineers is Sidney Dewberry. Since it began doing business in the 1950's, Dewberry has been in the name. It began as Greenhorne, O'Mara, Dewberry & Nealon. In 1968, it changed its name to Dewberry, Nealon & Davis. In 1981, the firm changed its name again, this time to Dewberry & Davis. Then in 2011, it changed its name to Dewberry Consultants. And finally, in 2017, the firm became known as Dewberry Engineers. So, for roughly 60 years, the firm has contained the name

---

[4] *See Callman on Unfair Competition, Trademarks and Monopolies* § 26:37 (4th ed. 2017) ("The Lanham Act's ultimate test is whether the primary significance of the mark is that of a surname to the purchasing public. The classification is a question of fact.").

Dewberry. And for almost all of those 60 years, the surname Dewberry was combined with other surnames as named partners of the engineering firm.

True, "Dewberry" could refer to a fruit and not a name. But Dewberry Engineers' comparison of "Dewberry" to "Apple" is, to say the least, a stretch. Steve Jobs' last name was not Apple. Sidney Dewberry's last name is Dewberry. When this evidence is construed in the light most favorable to the Dewberry Group, a reasonable factfinder could infer that the most significant aspect of Dewberry Engineers' marks results from the surname Dewberry. And that would mean the marks are descriptive and thus entitled to less protection. Said differently, properly applying the summary judgment standard to the evidence here requires a conclusion that the strength of the mark factor weighs against, not for, likelihood of confusion.

## B.

Second, consider the services the marks identify. This factor is measured by each party's "actual performance in the marketplace." *CareFirst of Md.*, 434 F.3d at 272. The district court found this factor weighed in favor of likelihood of confusion. In reaching this conclusion, it relied on the fact that Dewberry Engineers registered its mark under the real estate development and development related services category and that the Dewberry Group operates in that same area. *Dewberry I*, 2021 WL 5217016, at *8. While the evidence the court relied on may support its conclusion of overlapping services, it did not consider evidence pointing the other way.

The Dewberry Group introduced evidence that it develops properties like office buildings, shopping centers and hotels. In doing so, it acquires property, obtains financing

50

for purchases and construction and supervises the construction and other improvements. Afterward, it leases its properties to third-party tenants and provides management services for those properties. In contrast, while perhaps under the larger umbrella of real estate development services, Dewberry Engineers primarily provides engineering and architectural services to government and commercial entities.[5] Even though they operate in some of the same geographic areas, Dewberry Engineers and the Dewberry Group do not compete for business. In fact, the Dewberry Group once hired Dewberry Engineers to provide engineering services for one of the Dewberry Group's real estate development projects.

The district court did not consider any of this evidence. But when this evidence is construed in the light most favorable to the Dewberry Group, the similarity of services does not favor likelihood of confusion.

C.

Third, the district court found that the parties' advertising favored a likelihood of confusion largely because both Dewberry Engineers and the Dewberry Group operate and

---

[5] True, Dewberry Engineers does some work that more closely resembles what the Dewberry Group does. Through the Providence Corporation, it operates as "Dewberry Real Estate Services," which "obtain[s] financing for property acquisition and construction" and "negotiat[es] and arrang[es] for the acquisition of property for development." J.A. 2829. But since its primary work is providing professional architectural and engineering services to third parties, the different levels in which the parties operate in the real estate system presents a question of fact on whether there would be a likelihood of confusion as to the marks in relation to the normal consumers of the marks. *See Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991) ("The companies operate at different levels in the broad real estate industry and sell to two completely distinct sets of buyers.").

advertise in Virginia, Florida and Georgia and because both parties "promote[d] their architectural and interior design services in *Architectural Record* magazine." *Dewberry I*, 2021 WL 5217016, at *8. While I agree this evidence generally weighs in favor of similar advertising, the district court once again did not consider the record evidence suggesting the parties' advertising was dissimilar.

The Dewberry Group introduced evidence that Dewberry Engineers advertises through social media, electronic newsletters, conferences, trade shows, print media and press releases, all geared towards government and commercial entities that procure architectural and engineering services. It markets across the United States. Meanwhile, the Dewberry Group does not advertise through television, radio or print services. It does not advertise nationwide and does not market itself on social media. Instead, the Dewberry Group advertises through financial leasing packages to prospective tenants and internal fliers that are circulated to tenants within its developments. While both parties have websites that display the respective marks, there is still a genuine dispute of material fact for the jury to resolve as to the parties advertising.

This evidence, when construed in the light most favorable to the Dewberry Group, weighs against likelihood of confusion.

D.

Fourth, the sophistication of the consuming public can be a persuasive factor in the likelihood of confusion analysis. The district court appears to agree that Dewberry Engineers offers its services to sophisticated buyers, which cuts against Dewberry Engineers' motion for summary judgment. *Dewberry I*, 2021 WL 5217016, at *10–11. But

52

it then reasoned that "it would not be appropriate to conclude that the sophistication of the buyer is dipositive, especially in cases where actual tenants—the buyers in question—have demonstrated confusion." *Id.* at *10. I agree that the sophistication of Dewberry Engineers' customers is not dispositive. Even so, applying the summary judgment standard, their sophistication weighs against likelihood of confusion. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 128 (4th Cir. 1990) ("[W]e hold that in a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone, particularly without the benefit of trial.").

## E.

To summarize, as we have said in the past, weighing the likelihood of confusion factors generally involves genuine disputes of material fact. *Variety Stores, Inc.*, 888 F.3d at 666; *Anheuser-Busch, Inc.*, 962 F.2d at 318. That is because not all the factors are required to be considered or given the same importance. *George & Co., LLC*, 575 F.3d at 393. Thus, by its very nature, the application of these factors will involve weighing evidence and crediting certain evidence over others. But doing that is inappropriate at the summary judgment stage of the case. *Variety Stores, Inc.*, 888 F.3d at 659.

And aside from weighing the factors, the evidence pertaining to each factor must be construed in the light most favorable to the non-moving party. *Id*. 661–67. When that is done here, many of the factors the district court determined weighed in favor of likelihood of confusion actually point the other way. *See id.* at 666–67 (finding that although five of the factors favored the plaintiff, four of the factors—including the paramount "strength of the mark"—showed a genuine dispute of material fact, requiring the order granting

summary judgment on trademark infringement to be vacated). Under this record, the issue of likelihood of confusion should go to the jury. As a result, I would vacate the order granting summary judgment to Dewberry Engineers on its trademark violation claim, along with the order of damages relating to that claim and remand the case for further proceedings.

## II.

But even were summary judgment on the trademark infringement claims proper, the district court's use of revenues from separate companies affiliated with the Dewberry Group—who are not parties to the case—to assess the profits of the Dewberry Group was not. Relying on testimony from an expert witness of Dewberry Engineers, the court held that the Dewberry Group and its affiliated entities "will be treated as a single corporate entity when calculating the revenues and profits generated by [the Dewberry Group's] use of the Infringing Marks." *Dewberry Eng'rs, Inc. v. Dewberry Grp., Inc.* (*Dewberry II*), No. 20-cv-00610, 2022 WL 1439826, at *10 (E.D. Va. Mar. 2, 2022). It cited the Fifth Circuit's *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321 (5th Cir. 2008), decision as support for this holding. And it reasoned that to do otherwise, would "ignore the economic reality of how [the Dewberry Group's] business operates" and "undermine the equitable purposes of the Lanham Act's disgorgement remedy by enabling the entire Dewberry Group enterprise to evade the financial consequences of its willful, bad faith infringement." *Dewberry II*, 2022 WL 1439826, at *9–10.

The majority affirms this portion of the district court's order. It claims 15 U.S.C. § 1117(a)'s "subject to the principles of equity" language justifies including revenues from the related companies. And it reasons that "[a]dmonishing courts for using their discretion in this fashion risks handing potential trademark infringers the blueprint for using corporate formalities to insulate their infringement from financial consequences." Majority Op. at 42–43.

But the law does not insulate the Dewberry Group or any related entities that might have infringed on Dewberry Engineers' marks. There is no loophole that lets these entities infringe with impunity. If the corporations affiliated with the Dewberry Group participated in infringing activity, they would be subject to the reach of the Lanham Act. All Dewberry Engineers had to do was sue them. Or it could also try to pierce the Dewberry Group's corporate veil to eliminate the corporate separateness between it and those entities.[6] But I know of no law that allows courts, in assessing the profits of a defendant, to disregard those options and simply add the revenues from non-parties to a defendant's revenues for purposes of evaluating the defendant's profits.

---

[6] Assuming without deciding that Virginia law applies, piercing the corporate veil requires the trial court to consider "the particular factual circumstances surrounding the corporation and the acts in question." *O'Hazza v. Executive Credit Corp.*, 431 S.E.2d 318, 321 (Va. 1993). For example, in *O'Hazza* the court considered the initial capitalization, whether corporate formalities were disregarded, whether the corporation was started for a legitimate purpose and whether monetary funds were improperly accessed. *Id.* at 321–22. Virginia law has not designated a single fact or set of facts necessary to pierce the corporate veil, but it is generally appropriate to do so when an individual uses the corporate entity "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage" or if there is "unity of interest and ownership . . . such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *Dana v. 313 Freemason*, 587 S.E.2d 548, 553–54 (Va. 2003) (cleaned up). However, Virginia courts are "very reluctant to permit corporate veil piercing." *Id.* at 554.

55

After all, § 1117(a) speaks to the infringer's profits. And Dewberry Engineers alleges that the Dewberry Group, not third parties, was the infringer.

*American Rice* does not support Dewberry Engineers' claim that revenues from companies affiliated with the Dewberry Group can be considered in its disgorgement claim. There, the defendant, Producers Rice Mill, was a cooperative that realized profits during the infringing time period. When the plaintiff sought to disgorge those profits, Producers Rice Mill claimed its liability should be reduced based on the amount of those profits that it had passed on to its member farmers. *American Rice*, 518 F.3d at 326. The Fifth Circuit held that profits generated by Producers Rice Mill and later distributed to its members were nevertheless Producers Rice Mill's profits. *Id.* at 339–40. That makes sense. In deciding an infringer's net profits, legitimate costs can be deducted. But amounts distributed to members are not a cost. So *American Rice* deals with what costs can be deducted to determine an infringer's net profits. It does not say anything about using the revenues of separate companies to calculate net profits.

Unlike in *American Rice*, the revenues from the affiliated companies were never realized by the Dewberry Group. Nor did the district court hold that the Dewberry Group distributed profits it realized to its affiliated entities. To the contrary, because of what it described as "the economic reality of how [the Dewberry Group's] business operates," it treated the Dewberry Group and the related companies—which it acknowledged were separate corporate entities—as a single entity. *Dewberry II*, 2022 WL 1439826, at *9. *American Rice* offers no support for such a ruling. The district court's consideration of those revenues was incorrect as a matter of law.

56

III.

Because I find that the district court did not properly consider the likelihood of confusion factors in the light most favorable to the Dewberry Group, I would vacate the order granting summary judgment as to Dewberry Engineers' trademark infringement claim and the order granting the injunctive, disgorgement of profits and attorney's fees relief. And even were the order granting summary judgment proper, I would vacate the award for disgorgement of profits award based on the improper consideration of revenues from separate, non-party entities affiliated with the Dewberry Group.

I respectfully dissent.